IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| BRITTNEY JACOBS, | CV 20-149-BLG-SPW-KLD |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| CHANCE HILDEBRAND, in his official and individual capacities, COREY O'NEILL, in his official and individual capacities, JOHN DOE, in his official and individual capacities, CITY OF LIVINGSTON, MONTANA, a Municipality, | |
| Defendants. | |

Plaintiff Brittney Jacobs commenced this civil rights and state law tort action under 42 U.S.C. §§ 1983 and 1988 against Livingston police officers Chance Hildebrand, Corey O'Neill, and John Doe in their individual and official capacities, and the City of Livingston ("the City"), a municipality. Jacobs alleges Defendant police officers used excessive force when arresting her without cause, resulting in bodily injury and emotional distress. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

1

For the reasons discussed below, Defendants' motion should be granted and this action should be summarily dismissed.

## I.  Background[1]

At approximately 12:42 a.m. on March 24, 2019, officers Hildebrand and O'Neill responded to an emergency 9-1-1 call concerning a woman who had fallen and was "bleeding a lot from her head" in the alley behind the Owl Lounge in Livingston. (Docs. 26, ¶¶ 12, 19–20; 29, ¶¶ 8–9; 33, ¶ 5). While they arrived separately to the scene, both officers immediately observed that the injured woman, later identified as Jacobs, had an "obvious, severe head laceration," and "quite a bit" of blood was running down her face and into her hair and clothing. (Docs. 26, ¶ 19; 29, ¶¶ 10, 12; 33, ¶ 7). Officers also observed that Jacobs was intoxicated. (Docs. 26, ¶ 13; 29, ¶ 13; 33-1, ¶ 22). Jacobs later estimated she had visited five or six bars and consumed between ten and twelve drinks over the course of [four or five hours] that evening. (Docs. 26, ¶¶ 14–15; 29, ¶ 14).

---

[1] As discussed in § II, Jacobs' failure to file a separate Statement of Disputed Facts is, pursuant to Local Rule 56.1(d), "deemed an admission that no material facts are in dispute." Accordingly, unless clearly contradicted by the evidence, the Court finds the following facts as presented by Defendants' collective statements of undisputed facts and two patrol car video recordings, with audio, attached as exhibits E (dash) and F (back seat) to Defendant Officer Corey O'Neill's Statement of Undisputed Facts in Support of Motion for Summary Judgment (Doc. 29).

Officer Hildebrand approached Jacobs first, informing her that "you have a lot of blood there." (Exh. E; Doc. 33, ¶ 7). Jacobs immediately told Officer Hildebrand "don't you worry about me, I'm going home." (Exh. E). Jacobs walked away and Officer Hildebrand followed, telling her that she "seriously need[ed] some stitches." (Exh. E, Docs. 26, ¶ 24; 33-1, ¶ 5). Jacobs responded, "I don't care," and repeated that she was going home to bed. (Exh. E; Docs. 26, ¶ 24; 29, ¶ 33). Now out of view of the dash camera, officers can be heard in the video twice asking Jacobs to allow medics to look at her. (Exh. E). When she repeatedly refused, they told her, "right now this is a medical emergency," "you don't have a choice . . . *we* don't have a choice," and "I can't let you go home." (Exh. E; Docs. 26, ¶¶ 27–28; 29, ¶ 33). Jacobs replied, "I know, I'm f***ing bleeding out," but nevertheless insisted that she was "going home." (Exh. E).

Jacobs reappeared center frame on the dash camera video, reaching for her purse, which Officer O'Neill had previously placed on the hood of Officer Hildebrand's patrol car. (Exh. E; Doc. 29, ¶ 34). Officers surrounded Jacobs and each placed a hand around one of her wrists while pleading with her to "stop." (Exh. E; Doc. 29, ¶ 34). When Jacobs demanded officers let go of her, they did. (Exh. E). Officer O'Neill informed Jacobs that she had two options: either allow officers to place her in handcuffs and take her to the hospital for treatment, or

3

"wait for just a minute" for medics to arrive and examine her. (Exh. E; Docs. 26, ¶¶ 24–25; 29, ¶ 34). Jacobs responded, "ummmmm, I say no to both," before walking toward the Owl Lounge back door. (Exh. E; Doc. 29, ¶ 35). Both officers followed in quick succession, told Jacobs she was "not going anywhere," and informed her "if you're not going to cooperate and you're bleeding all over the place you're putting us in this position, OK." (Exh. E). When she continued to walk away, officers converged, placing Jacobs in handcuffs and informing her that while she was not under arrest, they could not allow her to walk away before being examined by medical personnel. (Exh. E; Doc. 29, ¶¶ 37–38). Officer Hildebrand can be heard explaining to Jacobs, "You are not fine. . . if I let you go home, there's a good chance that I find you dead later and I don't want that on my conscience." (Exh. E; Doc. 26, ¶ 27). When Jacobs continued to protest, Officer Hildebrand told her, "when it comes to medical shit like this . . . you don't have a choice." (Exh. E; Docs. 26, ¶ 28; 29, ¶ 40; 33-2, at 3).

Approximately six minutes after the officers' initial contact, medics from Livingston Fire and Rescue arrived and approached Jacobs, who was now standing on the curb with Officer Hildebrand while Officer O'Neill questioned witnesses across the street. (Exh. E; Doc. 29, ¶¶ 39, 41). Jacobs had become noticeably more agitated while waiting for the medics to arrive, calling the officers "mother*ckers,"

and addressing Officer Hildebrand as "bitch." (Docs. 26, ¶ 25; 29, ¶ 13; 33, ¶ 13). At one point, Jacobs broke away and started trying to run, but Officer Hildebrand grabbed her. (Exh. E). Officer Hildebrand warned Jacobs that if she did not stop trying to get away and continued to use abusive language, he would arrest her for disorderly conduct. (Exh. E). When the medics asked Jacobs for consent to treat her, she refused, telling them "I don't want you touching me." (Exh. E; Docs. 26, ¶ 26; 29, ¶ 41). Jacobs then whipped her head around causing the blood in her hair to spray the officers and medical personnel in her vicinity. (Exh. E; Docs. 29, ¶ 43; 33, ¶ 15). Officer Hildebrand and the medics conferred and agreed that Jacobs' wound needed medical attention, and Officer Hildebrand agreed to take Jacobs to the hospital for treatment. (Exh. E; Docs. 26, ¶ 26; 29, ¶ 42, 16; 33, ¶ 14).

As he escorted her to his patrol vehicle, video footage shows Jacobs twist her body, in what the officers describe as an obvious attempt to break free from Officer Hildebrand's grasp. (Exh. E; Docs. 29, ¶ 51; 33, ¶ 15). Officer Hildebrand testified that just before they reached the patrol car door, Jacobs kicked the car's front fender and forcefully tried to pull away again. (Exh. E; Doc. 33, ¶ 15). Officer Hildebrand testified that he executed a "controlled leg sweep," bringing Jacobs to the ground on her stomach. (Docs. 29, ¶ 52; 33, ¶ 15).

Officer O'Neill, who was speaking with Jacobs' friend Roger Burda about 25 feet away at the time, turned to see Jacobs resisting Officer Hildebrand as he walked with her toward the patrol car. (Doc. 29, ¶ 51). Officer O'Neill saw Officer Hildebrand take Jacobs the ground and then walked over to assist. (Exh. E; Doc. 29, ¶ 53). Officer Hildebrand repositioned Jacobs' handcuffs and officers lifted her to her feet. (Docs. 26, ¶ 30; 29, ¶ 54). While on the ground, officers can be heard repeatedly asking Jacobs to "please stop resisting," telling her "it doesn't have to go this way, we're trying to help you." (Exh. F; Docs. 26, ¶ 29; 29, ¶ 51). Once Jacobs was on her feet, Officer O'Neill returned to speak with Burda. (Exh. E).

After asking her six times to get into the car without her complying, Officer Hildebrand testified that he pushed Jacobs into the back seat of his patrol car. (Exh. E; Docs. 29, ¶ 58; 33, ¶ 15). The video and audio footage depicts that a struggle ensued, during which Officer Hildebrand can be heard shouting, "do not kick me." (Exh. E). The car's interior camera footage shows Jacobs sliding into the back seat, kicking both legs toward the door multiple times in quick succession. (Exh. F; Docs. 26, ¶ 30; 29, ¶ 58; 33, ¶ 15). Officer Hildebrand testified he "used [his] right foot to shove [Jacobs] further into the car while she was kicking [him]." (Doc. 33, ¶ 15). Officer Hildebrand can be heard on the patrol car's radio stating, "be advised, [Jacobs] just assaulted me." (Exh. F; 29, ¶ 58). Officer Hildebrand then

informed dispatch that he was taking Jacobs, who was "being extremely combative," to the hospital. (Exh. E; Doc. 29, ¶¶ 61, 63). Photographs show footprints on Officer Hildebrand's chest and leg. (Docs. 29, ¶ 58; 33, ¶ 18).

Throughout most of the interaction between Jacobs and the officers, witnesses repeatedly appear and interject to assure Jacobs the officers and medics are there to help. (Exh. E; Doc. 29, ¶¶ 27, 44). Jacobs' friend, Allie Savery, who had not seen Jacobs fall but heard the sound when her head impacted the ground, described her injuries as the "scariest thing I have ever seen." (Doc. 29, ¶ 20). Savery stated, "it was very obvious that there was a serious head injury" because "[h]er demeanor had changed from before and after in a way that I recognize as a head injury." (Docs. 26, ¶ 22; 29, ¶ 22). Burda characterized Jacobs' injury as "a traumatic head wound," telling officers that, even before they arrived, witnesses were pleading with Jacobs to go to the hospital for medical treatment. (Docs. 26, ¶¶ 22–23; 29, ¶¶ 21–22).

Officer Hildebrand transported Jacobs to the Livingston Memorial Hospital where she was diagnosed with an "acute head injury" and "acute forehead laceration." (Doc. 29, ¶ 65). While at the hospital, Jacobs spat blood onto the floor and continued to direct profanity at officers, repeatedly yelling at them to "get the f*** out of here." (Exh. E; Doc. 29, ¶ 66). On the way out of the hospital, Jacobs

kicked the glass sliding door in the waiting room. (Doc. 29, ¶ 69). Jacobs received

six or seven sutures for her wound before being transported to the Park County

Detention Center for booking. (Docs. 26, ¶ 31; 29, ¶ 64).

Officer O'Neill issued a misdemeanor citation to Jacobs for disorderly

conduct related to her behavior at the hospital. (Docs. 26, ¶ 33; 29, ¶ 70). Officer

Hildebrand cited Jacobs for disorderly conduct related to her behavior in the alley

behind the Owl Lounge, resisting arrest, assault on a peace officer for causing his

injuries, and criminal mischief for damaging his body camera when she kicked

him. (Docs. 26, ¶ 34; 29, ¶ 73; 33, ¶¶ 15–16). Park County later dismissed all

charges against Jacobs after the Park County Attorney failed to timely respond to

Jacobs' motion to dismiss. (Docs. 26, ¶ 40; 29, ¶ 74).

Jacobs filed the initial Complaint in this matter on October 21, 2020.

(Doc. 1). She filed an Amended Complaint on March 2, 2021, asserting the

following causes of action against Defendants Hildebrand, O'Neill, and Doe, in

their individual and official capacities as police officers for the City of Livingston:

(1) 42 U.S.C. § 1983 claim of excessive force (Count I); (2) false imprisonment

(Count II); (3) intentional infliction of emotional distress (Count III); (4) negligent

infliction of emotional distress (Count IV); (5) negligence (Count VII); and

(6) malicious prosecution (Count VIII). Jacobs pled the following claims against

Defendant City of Livingston ("the City"): (1) violations of her civil rights under a *Monell*[2] theory of liability and for failing to adequately hire, train, and supervise its officers (Count V), and (2) *respondeat superior* liability for the state law claims against the Defendant officers (Count VI and Count IX). (Doc. 20).

Defendants assert they are entitled to judgment as a matter of law on all claims. The Court shall address each in turn and provide additional facts as needed.

## II. <u>Legal Standard</u>

Under Rule 56(c), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249–50.

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), holding a municipality may be liable as a "person" under 42 U.S.C. § 1983 when it maintains a policy or custom that causes the deprivation of a plaintiff's federally protected rights.

The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007). The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007), focusing on whether a party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him").

Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattret*, 477 U.S. 317, 324 (1986). The non-moving party may not rest upon the mere allegations or denials of the pleadings." *Anderson*, 477 U.S. at 248.

Local Rule 7.1(d)(1)(B) provides that a "failure to file a response brief may be deemed an admission that the motion is well-taken." Additionally, Local Rule 56.1(b) requires the non-moving party to "file a Statement of Disputed Facts simultaneously with and separately from the response brief," setting forth the

specific facts that establish a genuine issue of material fact precluding summary judgment in favor of the moving party. The rule expressly requires that the statement include whether each fact in the moving party's statement is "undisputed" or "disputed," and if "disputed," it must include a "pinpoint cite to a specific pleading, deposition, answer to interrogatory, admission or affidavit before the court to oppose each fact." L.R. 56.1(b)(1). The non-moving party may add to its statement additional facts on which its opposition to summary judgment relies; each additional fact must also be set forth in serial form and supported by citations to the record. L.R. 56.1(b)(2).

Local Rule 56.1(d) provides that a party's "[f]ailure to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute." *Sargeant v. Bell*, No. CV-15-116-M-DLC-RWA, 2017 WL 2313864, *3 (D. Mont. Jan. 12, 2017), *report and recommendation adopted by* 2017 WL 2313465 (D. Mont. May 26, 2017), *aff'd*, 730 F. App'x 501 (9th Cir. 2018); *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (recognizing the validity of local rules that deem facts admitted for summary judgment purposes when not properly opposed). *See also* Fed. R. Civ. P. 56(e)(2)–(3) ("If a party fails to properly support an assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion

and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.").

Nevertheless, the Ninth Circuit has made clear that a district court may not grant "summary judgment simply because a party fails to file an opposition or violates a local rule"; the court must "analyze the record to determine whether any disputed material fact [is] present." *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1258 (9th Cir. 2010); *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) ("a nonmoving party's failure to comply with local rules does not excuse the moving party's affirmative duty under Rule 56 to demonstrate its entitlement to judgment as a matter of law").

Defendants move for summary judgment on all claims. Defendant City of Livingston filed its summary judgment motion on March 17, 2022. (Doc. 24). Pursuant to Local Rule 7.1(d)(1)(B), Jacobs' response to Defendant City of Livingston's motion was due on or before April 7, 2022. As of the date of these findings and recommendation, Jacobs has not filed any response to Defendant City of Livingston's motion. Defendants O'Neil and Hildebrand filed separate motions for summary judgment on March 18, 2022. (Docs. 27 and 31). Jacobs filed a combined response to defendants O'Neil's and Hildebrand's motions on June 20,

2022 (Doc. 37), two months after the deadline to file a response to the officers' motions expired.

In addition to being untimely, Jacobs' response brief is technically and substantively deficient. Jacobs has not filed a Statement of Disputed Facts, as is required of the party opposing summary judgment under Local Rule 56.1(b), and the factual assertions in her motion are made without any citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits for support. Included in Defendants' summary judgment briefing are their respective statements of undisputed facts, which in turn cite to numerous attached exhibits, including expert testimony, affidavits from officers Hildebrand and O'Neill, police records, and two dash cam audio and video recordings from Officer Hildebrand's patrol car depicting the vast majority of Jacobs' interaction with police. Because Jacobs has neither filed a Statement of Disputed Facts nor cited to any materials of record showing there are genuine issues of material fact in her response brief opposing summary judgment, pursuant to the federal Rule 56(e)(2) and Local Rule 56.1(b) and (d), unless clearly contradicted by the evidence, the Court will consider the facts provided in Defendants' respective statements of undisputed facts (Docs. 26, 29, and 33) undisputed for purposes of summary judgment.

On the merits, Jacobs' response brief asserts new violations of her First Amendment rights to freedom of speech and assembly, as well as constitutional rights to privacy and medical freedom, none of which were plainly alleged in her Amended Complaint. A party cannot assert new claims for the first time in response to a motion for summary judgment. *Navajo Nation v. United States Forest Servs.*, 535 F.3d 1058, 1080 (9th Cir. 2008). *See Jack Palmer & Carwerks v. City of Missoula*, No. CV-14-203-M-DLC, 2016 WL 247564, *4 (D. Mont. Jan. 20, 2016) (holding summary judgment appropriate on plaintiff's newly-asserted, unpled constitutional violation). As Jacobs failed to request leave to amend her pleadings in conformity with Rule 15(a), any new arguments not properly pled are waived at this stage in the proceeding.[3]

Bearing the above principles in mind, the Court turns now to the question of whether Defendants have met their summary judgment burden of establishing they are entitled to judgment as a matter of law.

---

[3] As Defendants point out, Jacobs' response brief fails to conform to the local rules in several other respects: the brief contains no Table of Contents or Table of Authorities and is 3,712 words over the word limit for response briefs without prior leave, in violation of Local Rule 7.1(d)(2)(A) and (C). Jacobs did not request advance permission from the Court to file an overlength brief. Despite these obvious technical failings, the Court will consider Jacobs' response to the allegations properly before the Court.

## III.  Discussion

### A. 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

To obtain relief under § 1983, plaintiffs must "plead that (1) the defendants acting under color of state law (2) deprived plaintiffs of rights secured by the Constitution or federal statutes." *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021). A person deprives another of a constitutional right "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479

F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

Jacobs pleads claims against Officer Hildebrand for using excessive force while arresting her, against Officer O'Neill and unknown Officer Doe for failure to intervene, against the City for having policies or customs that allegedly caused her constitutional deprivation, as well as the City's failure to exercise reasonable care in hiring, training and supervising its police officers.[4]

Officers Hildebrand and O'Neill contend they are entitled to qualified immunity on Jacobs' excessive force claim because Jacobs has failed to establish their conduct was unconstitutional, and alternatively, any constitutional violations

---

[4] It is unclear whether Jacobs' Amended Complaint asserts separate Fourth Amendment violations for unlawful seizure under § 1983, in addition to her state law claim of false imprisonment. *See* Doc. 20, ¶¶ 18–19, 22. Excessive force is a separate and distinct inquiry from unlawful arrest. *Cane v. O'Neill*, No. CV-20-32-BLG-TJC, 2022 WL 4088165, at *11 (D. Mont. Mar. 31, 2022), *reconsideration denied*, 2022 WL 4079217 (D. Mont. Sept. 6, 2022), *appeal docketed*, No. 22-35936 (9th Cir. Nov. 29, 2022) (citing *Velazquez v. City of Long Beach,* 793 F.3d 1010, 1024 (9th Cir. 2015)). Thus, while the Court finds that Jacobs' "shotgun" pleading fails to give Defendants adequate notice of any unlawful seizure claims against them as is required under Fed. R. Civ. P. 8(a), as discussed below, it nonetheless concludes the undisputed facts show that officers had probable cause to arrest Jacobs. Because "a court's determination of probable cause is a complete defense to a claim of false arrest or imprisonment," to the extent Jacobs does allege a Fourth Amendment violation for unlawful seizure, the claim should be dismissed. *Wagemann v. Robinson*, No. CV-13-78-BU-DLC-CSO, 2015 WL 3899226, *10 (D. Mont. June 16, 2015).

by the officers were not clearly established. The City argues it is entitled to summary judgment on Jacobs' § 1983 claims because no civil rights violation occurred. Additionally, the City argues Jacobs has failed to present adequate evidence to support a *Monell* theory of liability against it. The Court will address each issue in turn.

## 1. Qualified Immunity

The doctrine of qualified immunity protects government officials from personal liability in their individual capacities for their official conduct as long as that conduct is "objectively reasonable and does not violate clearly-established federal rights." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 964 (9th Cir. 2010); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (stating that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law").

In determining whether a police officer is entitled to qualified immunity, the court must ask whether the alleged facts establish that the defendant violated a constitutional right, and whether the right at issue was "clearly established" at the time of the alleged misconduct. *Rodis v. City and Cnty. of San Francisco*, 558 F.3d 964, 968 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). These two prongs of the analysis need not be considered in any particular order, and both

prongs must be satisfied for a plaintiff to overcome a qualified immunity defense. *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (modifying the *Saucier* two-step procedure to allow courts to evaluate either prong in the order that will best facilitate the fair and efficient disposition of each qualified immunity case).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). In determining whether the law has been clearly established, there does not need to be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The dispositive question is therefore whether the violative nature of particular conduct is clearly established in the specific context of the case." *Vos*, 892 F.3d at 1035.

The plaintiff bears the burden of showing the rights allegedly violated were clearly established. *Shafer*, 868 F.3d at 1118. Even if the plaintiff has alleged violations of a clearly established right, the government official is entitled to qualified immunity if he or she made a reasonable mistake as to what the law requires. *See Saucier*, 533 U.S. at 205. *See also Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) ("Qualified immunity is an affirmative defense that the

government has the burden of pleading and proving."). The "existence of a statute or ordinance authorizing particular conduct is a factor which militates in favor of the conclusion that a reasonable officer would find that conduct constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994).

### a. Constitutional Violation

Jacobs alleges officers used excessive force when arresting her. (Doc. 20, ¶ 35). Specifically, Jacobs claims Officer Hildebrand "grabbed Jacobs and physically threw her to the ground while pulling her out of the recording area for his in car camera video recording" (Doc. 20, ¶ 17), and Officer O'Neill "did not intervene or otherwise attempt to stop Hildebrand from assaulting, dragging, and unlawfully arresting Jacobs" (Doc. 20, ¶ 23).[5] The officers argue Jacobs' excessive force claims must fail because their use of *de minimus* force was reasonable and justified under the circumstances.

Excessive force claims implicate the Fourth Amendment's right against unreasonable seizures. *Graham*, 490 U.S. at 395. Officers may only use force that

---

[5] Jacobs' Amended Complaint alleges that Officer Doe, an unknown officer who at some unspecified point in time "arrives on the scene," also "failed to take reasonable steps to end the unlawful conduct." (Doc. 20, ¶ 8). Jacobs provides no further allegations to support her claim against Doe. Because Jacobs fails to allege with any specificity Defendant Doe's constitutional violations, her claims against Doe should be dismissed. *Anderson*, 477 U.S. at 248.

is "objectively reasonable" under the circumstances; "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Ames v. King Cnty.*, 846 F.3d 340, 348 (9th Cir. 2017). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

In determining whether the use of force was objectively reasonable, the court balances the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Vos*, 892 F.3d at 1030. Characterizing the amount of a non-lethal force, including take-downs, often depends on specific factual circumstances. *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021). Courts may infer from the minor nature of a plaintiff's injuries that the force applied was minimal." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018). "The strength of the government's interest is measured by examining three primary factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Vos*, 892 F.3d at 1031. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer

on the scene, rather than with the 20/20 vision of hindsight." *Vos*, 892 F.3d at 1031

(quoting *Graham*, 490 U.S. at 396).

### i.  Officer Hildebrand

It is undisputed that when officers arrived to the alley behind the Owl

Lounge, Jacobs was severely injured, bleeding heavily, and refusing to seek

medical care or allow anyone with medical training to assess the extent of her

injuries. (Exh. E; Docs. 26, ¶¶ 19, 23–25; 29, ¶ 13; 33, ¶¶ 7–8). Both officers stated

they were highly concerned for Jacobs' safety. (Docs. 29, ¶ 32; 33, ¶ 7). The video

evidence and testimony in the undisputed record shows that Jacobs was

intoxicated, verbally and physically combative toward officers, and repeatedly

attempted to flee while officers and witnesses pleaded with her to allow medical

personnel to examine her. (Exh. E; Docs. 26, ¶¶ 13, 25, 30; 29, ¶¶ 44, 61; 33, ¶¶ 6,

8). There is no genuine dispute that it was in Jacobs' best interest to allow medical

personnel to assess her injuries—in fact, Jacobs stated in her deposition that she

"[p]robably should have just stood there, cooperated. Have somebody take a look -

- a peek at my head and then went about my way." (Doc. 29-7, at 14–17).

Additionally, while arguing with Officer Hildebrand that night, Jacobs

acknowledged the urgency of her condition when she conceded she was "bleeding

out," but then continued to insist she did not need any help—a conclusion with

which all witnesses, officers, and medical personnel unanimously disagreed. (Exh. E; Doc. 29, ¶¶ 42, 62). Under the totality of the circumstances, when judged from the perspective of a reasonable officer on the scene, the Court finds Defendants established there were significant governmental interests at stake.

Weighing the significant governmental interest against the nature and quality of the intrusion on Jacobs' rights, the officers' use of force in this case was objectively reasonable. Jacobs claims Officer Hildebrand "grabbed" her and "physically threw her to the ground," but this claim is unsupported by the record. Rather, the undisputed record establishes Officer Hildebrand performed a "front leg sweep maneuver," which caused Jacobs to fall forward "flat on her stomach." (Docs. 26-2, at 21; 33, ¶ 15). Although the takedown itself occurred off-camera, there is no factual basis in the record for Jacobs' claim that Officer Hildebrand "dragged" her out of the camera's view so that he could "throw her to the ground."

The undisputed evidence shows Jacobs was actively resisting arrest. It is undisputed that Officer Hildebrand warned Jacobs that he would charge her with disorderly conduct if she continued to fight him and verbally berate him. (Exh. E; Docs. 29, ¶ 47; 33, ¶ 9). Just prior to the take-down, video footage shows Jacobs twist her body away from Officer Hildebrand as he escorted her to his patrol car. (Exh. E). Burda testified that Jacobs "was resisting and combative." (Doc. 29-9, at

13). Officer O'Neill witnessed Jacobs "flailing and twisting, attempting to get free" from Officer Hildebrand. (Doc. 29-1, at 7). It is undisputed that Jacobs kicked the front Officer Hildebrand's patrol car. (Docs. 26, ¶ 25; 29, ¶ 58; 33, ¶ 15). Officer Hildebrand testified that he conducted the leg sweep maneuver because he felt it was "necessary to regain control of the situation" after Jacobs' already agitated and combative behavior had escalated. (Doc. 33, ¶ 15).

Defendants also point out there is no evidence that this takedown maneuver caused Jacobs further injury or noticeable pain. Jacobs claims she had bruises on her face, wrists, and arms resulting from the officers' use of excessive force, but Jacobs has provided no evidence beyond mere speculation that her injuries were in fact caused by the officers as opposed to her own actions. In her deposition, Jacobs claimed her head wound was neither very deep nor bleeding profusely until officers "threw me down" and "yanked me up" (Doc. 26-2, at 2); however, this assertion is contrary to witness testimony and video evidence that clearly shows the wound on Jacobs' forehead was bleeding profusely before officers arrived, and well before the controversial physical interactions occurred. On the other hand, after she was taken to the ground by Officer Hildebrand, Jacobs did not shout out

in pain, did not tell officers they were hurting her, and continued to aggressively lash out at Officer Hildebrand.[6]

Burda, who witnessed some of Jacobs' scuffle with Officer Hildebrand, did not express concern about excessive force to officers at the time, but in his deposition, he described the incident as "unpleasant." (Exh. E; Doc. 29-9, at 13–14). Burda testified that he "had a little bit of a problem with, obviously, Bea having a knee in her back and when she had such a severe head wound, on the ground." (Doc. 29-9, at 13). Defendants' unrebutted expert concluded the amount of force Officer Hildebrand used was appropriate under the circumstances and consistent with law enforcement best practices. (Doc. 32, at 12–13). Perhaps with the perfect 20/20 vision of hindsight, in the peace of a judge's chambers, Officer Hildebrand's takedown maneuver may not seem absolutely necessary, but the law permits officers to use some degree of physical coercion to effect a lawful arrest. *Ames*, 846 F.3d at 348; *Graham*, 490 F.3d at 396.

On these facts, the Court finds the nature and quality of force Officer Hildebrand used to effectuate Jacobs' arrest was minimal to moderate, at most, and reasonably required to effectuate the arrest of an intoxicated, combative individual

---

[6] Jacobs testified in her deposition that she laughed "[a]fter he threw me down because I didn't want him to know that it just hurt me." (Doc. 26-2, at 22).

who required urgent medical care and was either incapable or unwilling to seek it on her own.

Thus, Officer Hildebrand is entitled to summary judgment on Jacobs' excessive force claims because Jacobs has failed to show his conduct violated her constitutional rights.

### ii. Officer O'Neill

Jacobs' claim against Officer O'Neill is primarily for failure to intervene; her only use of force allegation against Officer O'Neill is that he "yanked" her to her feet while she was handcuffed. (Doc. 29-7, at 47). At the outset, there is no evidence in the record to support Jacobs' claim that the force Officer O'Neill used to lift her to her feet was excessive. In his affidavit, Officer O'Neill states:

> Officer Hildebrand and I helped Ms. Jacobs off the ground with one of us holding each of her arms. This was not a violent or aggressive action and instead was a smooth process. Ms. Jacobs did not make any complaints or give any indication otherwise. We did not pull her up by her handcuffs.

(Doc. 29-1, at 8). This testimony is consistent with the video footage, which shows most of Officer O'Neill's body rising smoothly, holding onto Jacobs with one hand. (Exh. E; Doc. 29, ¶ 54). Therefore, to the extent Jacobs alleges that Officer O'Neill personally used excessive force when lifting her to her feet, that claim fails.

As to Jacobs' primary accusation against Officer O'Neill, failure to intervene, this claim also falls short. The Ninth Circuit has held that while "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or another citizen," officers can only be held liable for failing to intervene "if they had an opportunity to intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (citing *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990), granting arresting officers' motion for summary judgment because the officers had no "realistic opportunity" to prevent an attack committed by another officer). The Seventh Circuit has articulated the elements of a failure to intervene claim as follows: to succeed on this claim, a plaintiff must demonstrate that the officer (1) knew a constitutional violation was committed; and (2) had a realistic opportunity to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

First, because the Court finds that Officer Hildebrand did not use excessive force, Officer O'Neill cannot be held liable for failing to intervene as a matter of law as there was no constitutional violation for him to try to prevent. Additionally, Officer O'Neill maintains that he did not witness Officer Hildebrand use excessive force. (Doc. 29, ¶ 126). The undisputed evidence establishes that Officer O'Neill was speaking with Burda about 25 feet away from Jacobs when Officer Hildebrand

26

performed the leg sweep that brought her to the ground. (Exh. E; Doc. 29, ¶ 50).
When he heard the skirmish, Officer O'Neill immediately walked over to assist.
(Exh. E; Doc. 29, ¶ 53). Three witnesses—two medics and Burda—watched,
without displaying any indication of objection or outrage, as officers lifted Jacobs
to her feet. (Exh. E; Doc. 29, ¶ 56).

As these facts are undisputed, Officer O'Neill neither knew that a
constitutional violation was committed nor had a realistic opportunity to prevent it.
Accordingly, Jacobs has failed to establish an excessive force claim against Officer
O'Neill.

### b. Clearly Established Right

As discussed above, because the Court concludes that neither officer
committed a constitutional violation against Jacobs, both officers Hildebrand and
O'Neill are entitled to qualified immunity on the first prong of the analysis. As to
the second prong of the qualified immunity analysis, Jacobs has also failed to
establish that existing precedent placed the constitutional question beyond debate.
In fact, Jacobs fails to identify any legal precedent where an officer's acts, under
similar circumstances, were deemed unconstitutional. Consequently, the Court is
aware of no precedent from the Supreme Court, the Ninth Circuit, or this District
that clearly establishes an officer's use of progressive force culminating in a leg

sweep maneuver to detain an actively-resisting individual in need of prompt medical care amounts to excessive force. Rather, the vast majority of relevant case law surveyed leads the Court to the opposite conclusion.

In *Shafer*, the Ninth Circuit held that an officer did not violate clearly established law by progressively increasing his use of force from verbal commands to an arm grab, and then a leg sweep maneuver, when a misdemeanant refused to comply with the officer's orders and resisted, obstructed, or delayed the officer who had probable cause to arrest him. 868 F.3d at 1118. Similarly, in *Garcia v. City of Santa Clara*, the Ninth Circuit upheld a finding of qualified immunity for officers who, while attempting to arrest the plaintiff for a misdemeanor, used control holds, punches, and a leg sweep. 772 F. App'x 470, 472 (9th Cir. 2019). *See also Bennett v. Gow*, 345 F. App'x 286, 287 (9th Cir. 2009) (affirming qualified immunity for an officer who used relatively minor force to push the plaintiff to the ground after the plaintiff refused to stop twisting while the officer was trying to handcuff him). In *Bennett*, the Ninth Circuit stated, "Although certainly uncomfortable, and unpleasant, the take-down was not an objectively unreasonable use of force, and the district court properly granted qualified immunity to [the officer] on this claim." *Bennett*, 345 F. App'x at 287.

Based on the established case law in this circuit, another court in this district recently awarded qualified immunity to a deputy who faced a non-compliant individual, finding that based on the aforementioned legal precedents, he was not sufficiently on notice that the progressive use of force from verbal commands to an arm grab, and eventually a takedown maneuver was unlawful. *Cane*, 2022 WL 4088165, at *13.[7]

Further, under qualified immunity's burden-shifting framework, Defendants have adequately established the officers reasonably believed they acted within the scope of their duties under Montana's community caretaker doctrine, which imposes an affirmative duty on police officers "to investigate situations in which a citizen may be in peril or need some type of assistance from an officer." *State v. Lovegren*, 51 P.3d 471, 474 (Mont. 2002). The Montana Supreme Court has summarized the doctrine as follows:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been

---

[7] In *Cane*, the Court declined to decide the first prong of the qualified immunity analysis because while there were "serious questions . . . regarding the reasonableness of the force used," the officer was nevertheless entitled to qualified immunity under the clearly established prong. 2022 WL 4088165, at *11.

mitigated, then any actions beyond that constitute a seizure
implicating not only the protections provided by the Fourth
Amendment, but more importantly, those greater guarantees
afforded under Article II, Sections 10 and 11 of the Montana
Constitution as interpreted in this Court's decisions.

*Lovegren*, 51 P.3d at 475–76.

Here, Defendant officers clearly had objective, specific, and articulable facts
to suspect Jacobs needed help. Officers responded to an emergency 9-1-1 call to
find Jacobs intoxicated and bleeding profusely from a severe head wound. Officers
quickly learned that Jacobs was refusing to voluntarily seek medical care and
explained to Jacobs that they simply could not allow her to leave without being
checked out by medical personnel. When Jacobs continued to refuse, officers
repeatedly attempted to de-escalate the situation by asking her to cooperate and
warning her that she would face charges if she continued to resist. The officers'
insistence on rendering aid per their statutory duty was objectively reasonable and
appropriate under the circumstances. At no point until Jacobs actually received a
medical assessment of her injuries could the officers be assured that she was no
longer in peril.

In sum, Defendant officers are entitled to qualified immunity under the
second prong of the analysis because Jacobs has failed to meet her burden of
proving the rights they allegedly violated were clearly established. Even had she

met it, under the doctrine's burden-shifting framework, the officers have shown
they reasonably believed their conduct was lawful.

Therefore, summary judgment should be granted to officers Hildebrand and
O'Neill on Jacobs' excessive force claims.

### 2. *Monell* Liability

It is well-established that a local governmental unit may not be held
responsible for the acts of its employees under a *respondeat superior* theory of
liability. *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403
(1997). A municipality may only be held liable as a "person" under 42 U.S.C.
§ 1983 "when it maintains a policy or custom that causes the deprivation of a
plaintiff's federally protected rights." *Hyun Ju Park v. City & Cnty. of Honolulu*,
952 F.3d 1136, 1141 (9th Cir. 2020); *Kirkpatrick v. Cnty. of Washoe*, 843 F.3d
784, 793 (9th Cir. 2016) ("To [prevail on a claim against a municipal entity for a
constitutional violation], a plaintiff must go beyond the *respondeat superior* theory
of liability and demonstrate that the alleged constitutional deprivation was the
product of a policy or custom of the local governmental unit.").

To impose liability on a local government entity under *Monell*, a plaintiff
must establish: (1) that she was deprived of a constitutional right; (2) that the
municipality had a policy; (3) that this policy "amounts to deliberate indifference"

to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Jacobs' *Monell* claim against Defendant City of Livingston fails on multiple grounds. As discussed above, Jacobs has not established officers deprived her of a constitutional right. *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) (noting that an underlying constitutional violation is necessary to incur *Monell* liability). Had a constitutional violation occurred, Jacobs' claim against the City nevertheless must fail because she has not provided sufficient evidence to establish liability. While Jacobs pled several distinct avenues for municipal liability in her Complaint, she apparently concedes the merits of her claims as she has declined to submit any response to the City's arguments for summary judgment. *Beaton v. First Nat. Bank of Montana, Inc.*, No. CV-08-25-M-RFC-JCL, 2009 WL 2986419, *2 (D. Mont. Sept. 15, 2009) (plaintiff abandoned claim by failing to address defendant's arguments for summary judgment in response brief); *Bailey v. P.B. Bell Asset Mgmt. Inc.*, No. CV-19-01761-PHX-SMB, 2020 WL

6680364, *9 (D. Ariz. Nov. 12, 2020) ("A party abandons claims by not raising

them in opposition to a motion for summary judgment.").

Even if the claim is not abandoned, the City correctly points out that Jacobs

has not cited to any materials of record establishing that a policy amounting to

deliberate indifference to her rights exists. For example, in her response to the

City's discovery request, Jacobs asserted that the City's "Use of Force" policy is

unconstitutional because it "allow[s] officers to use their own discretion to

determine what level of force is necessary in effectuating an arrest or in detaining a

citizen." (Doc. 26-12, at 2). But Jacobs did not assert which specific section or

sections of the City's use of force policy were inadequate, or respond in any way to

the City's expert, who concluded the City's formal policies, informal customs, and

training and hiring practices were satisfactory. (Doc. 26, ¶¶ 46–50).

On the other hand, the City disclosed the Livingston Police Department

standard operating procedure manual, field training officer training program,

policy manual, and rules and regulations of the Livingston Police Department

(Doc. 26-1), as well as its expert report (Doc. 26-11). The Policy Manual states:

> It is the policy of the Livingston Police Department that officers use
> the amount of force which is objectively reasonable to make an arrest,
> gain control of a situation, or to protect the officer or another from
> harm, given the facts and circumstances perceived by the officer at the
> time force is applied.

(Doc. 26-1, at 6). The policy manual instructs police officers to consider "whether the subject is actively resisting arrest or attempting to evade seizure by flight" as a relevant factor in the application of force. (Doc. 26-1, at 6). Defendants' expert Mark Muir, a retired chief of police and lawyer, concluded the Livingston Police Department policies provide officers with sufficient guidance in the application of force, restraint, arrest, searches and seizures, and that those policies are reasonable. (Doc. 26-11, at 20–22). The Court agrees; nothing in the record clearly rebuts Muir's opinion that none of the City's formal use of force policy amounts to deliberate indifference to Jacobs' constitutional rights.

Additionally, considering the undisputed evidence in the record, Jacobs cannot show a policy of the City of Livingston was the moving force behind her alleged constitutional violations. "The Rules of Civil Procedure are clear—the party opposing summary judgment cannot rest upon its complaint or answer but must show specific facts that set forth a genuine issue of material fact." *Wescott v. Nw. Drug Task Force*, No. CV-05-130-M-LBE, 2006 WL 2714952, at *8 (D. Mont. Sept. 20, 2006) (citing Fed. R. Civ. P. 56(e)).

In the absence of any evidence of a genuine issue of material fact as to whether an unconstitutional municipal policy or custom exists, Jacobs' § 1983 claims against the City should be summarily dismissed.

**B. State Law Claims**

Having determined that Jacobs' federal constitutional claims do not survive

summary judgment, the Court concludes that retaining jurisdiction over any state

law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v.*

*Gibbs*, 383 U.S. 715, 726 (1966); *Acri v. Varian Associates, Inc*., 114 F.3d 999,

1001 (9th Cir. 1997) ("in the usual case in which all federal-law claims are

eliminated before trial, the balance of factors . . . will point toward declining to

exercise jurisdiction over the remaining state-law claims"). Accordingly, the Court

recommends Jacobs' state law claims be dismissed without prejudice.

## IV.   <u>Conclusion</u>

For the above reasons, the Court concludes that Defendants have met their

initial burden as the party moving for summary judgment by showing that there are

no material issues of fact and they are entitled to judgment as a matter of law on

Jacobs' federal claims. Because Defendants have satisfied their burdens of

production and Jacobs has failed to identify any specific facts showing a genuine

issue for trial,

IT IS RECOMMENDED that Defendants' respective motions for summary

judgment be GRANTED as to Count I and Count V. All other claims should be

DISMISSED without prejudice.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

IT IS ORDERED.

DATED this 19th day of December, 2022.

Kathleen L. DeSoto
United States Magistrate Judge